**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **JESSICA L.[1],** | ) | NO. CV 18-3530-KS |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**INTRODUCTION**

Jessica L. ("Plaintiff") filed a Complaint on April 26, 2018, seeking review of the denial of her applications for a period of disability, Disability Insurance benefits ("DI"), and Supplemental Security Income ("SSI"). On June 7, 2018, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-13.) On January 28, 2019, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 23.) Plaintiff seeks an order reversing the Commissioner's decision and ordering the payment of benefits. (Joint Stip. at 31-32.) The Commissioner requests that the ALJ's

_____

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

decision be affirmed or, in the alternative, remanded for further proceedings. (*See* AR 32-34.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On April 17, 2014, Plaintiff, who was born on October 18, 1966, filed applications for a period of disability and DI as well as for SSI.[2] (*See* Administrative Record ("AR") 131, 243, 247; Joint Stip. at 1.) Plaintiff alleged disability commencing November 8, 2013 due to: "depression, anxiety/panic disorder/sleep disorder." (AR 282.) Plaintiff previously worked as a cook (DOT 315.361-010), cash accounting clerk (DOT 211.362-010), and a receiving clerk (DOT 222.387-050). (AR 138; *see also id.* 283.) After the Commissioner denied Plaintiff's applications initially (AR 104-05) and on reconsideration (AR 106-07), Plaintiff requested a hearing (AR 165-66). Administrative Law Judge Richard T. Breen ("ALJ") held a hearing on September 29, 2016. (AR 42.) Plaintiff, who was represented by counsel, testified before the ALJ as did vocational expert ("VE") Howard Goldfarb. (AR 42-83.) On December 6, 2016, the ALJ issued an unfavorable decision, denying Plaintiff's applications. (AR 131-40.) On March 27, 2018, the Appeals Council denied Plaintiff's request for review. (AR 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the November 8, 2013 alleged onset date. (AR 133.) The ALJ determined that Plaintiff had the following severe impairments: bipolar disorder with depression and anxiety. (AR 133.) The ALJ also found that Plaintiff had a medically determinable but non-severe impairment of

---

[2]    Plaintiff was 46 years old on the application date and thus met the agency's definition of a younger person. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff has since changed age categories and is now categorized as a person closely approaching advanced age. *See id.* §§ 404.1563(d), 416.963(d).

type II diabetes.  (AR 133.)  After considering listings 12.04 and 12.05 specifically, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  (AR 17.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following limitations:

> [She] is limited to understanding, remembering, and carrying out instructions at a simple, routine, and repetitive task level, but not at a production rate pace (e.g. assembly line work); is limited to occasionally responding appropriately to coworkers (superficial level); can never respond appropriately to the public; can never work around flashing lights; and is limited to moderate noise exposure.

(AR 135.)

The ALJ found that Plaintiff was unable to perform her past relevant work as a cook (DOT 315.361-010), cash accounting clerk (DOT 211.362-010), and a receiving clerk (DOT 222.387-050).  (AR 138.)  However, the ALJ also found that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of cleaner (DOT 381.687-018), polisher (DOT 761.684-026), and marker (DOT 209.587-034).  (AR 139.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the ALJ's decision.  (AR 139-40.)

\\
\\
\\

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error,

‘the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

There are two issues in dispute: (1) whether the ALJ erred in rejecting the opinions of Plaintiff's treating psychiatrist and former treating therapist in favor of the opinions of Plaintiff's former treating psychiatrist, the reviewing physicians, and the consultative examining physician; and (2) whether the ALJ properly evaluated the credibility of Plaintiff's statements about her symptoms and limitations. (Joint Stip. at 3.)

## I. The ALJ's Evaluation of the Medical Opinions

The first issue in dispute concerns the ALJ's evaluation of the opinion of Plaintiff's treating psychiatrist, Timothy Jack, M.D., and former treating therapist, Marysol Rezanov, LCSW. (Joint Stip. at 3.) "The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

Generally, the opinion of a treating source is entitled to greater weight than the opinion of doctors who do not treat the claimant because treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison*, 759 F.3d at 1012; *see* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (governing claims filed before March 27, 2017); *see also* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) (governing claims filed on or after March 27, 2017). Accordingly, to reject an

5

uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). Alternatively, "[i]f a treating or examining doctor's opinion *is* contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675 (emphasis added). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

An ALJ does not commit legal error *per se* solely by according greater weight to the opinion of a nonexamining State agency physician than to the contradictory opinion of a treating physician. *See, e.g.*, *Morgan v. Comm'r of. Soc. Sec. Admin.*, 169 F.3d 595, 600-03 (9th Cir. 1999). Additionally, an ALJ may properly reject a treating physician's conclusions that do not "mesh" with the treating physician's objective data or history. *See, e.g.*, *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

### A. ALJ's Evaluation of the Opinion of Timothy Jack, M.D.

#### 1. Plaintiff's Treatment History at Dr. Jack's Clinic

The record contains "Progress Notes Reports" from the Los Angeles County Department of Mental Health ("LACDMH") reflecting treatment that Plaintiff received at the West Valley Mental Health Center, the clinic of her treating psychiatrist, Timothy Jack, M.D. (*See* AR 1186-1266.) These treating notes are summarized below.

On October 15, 2015, Plaintiff saw Elizabeth Gil, Ph.D., a licensed psychologist, who observed that Plaintiff was agitated and irritable and expressed a desire to switch psychiatric care to the West Valley Mental Health Center. (AR 1186.) According to the "Initial Contact Data" from this appointment, Plaintiff avoided eye contact, exhibited agitated motor activity, a "sensitive" interactional style, a "tearful, irritable, hopeless/worthless, anxious" mood, and an "expansive, worried" affect. (AR 1262.) Plaintiff reported her last episode of mania occurred a year prior, in October 2014. (AR 1264.) Plaintiff reported "depressed mood, crying spells, lack of interest in things, memory problems, anxiety, hopelessness." (AR 1264.) On October 20, 2015, Plaintiff completed the intake assessment with Dr. Gil. (AR 1189.) Plaintiff indicated that she had been effectively treated with electroconvulsive therapy ("ECT") and received 28 treatments starting in 2012. (AR 1189.) She expressed a desire to continue receiving ECT but stated that she did not have the resources to do so. (AR 1189.)

Plaintiff saw Dr. Gil again on October 27, 2015. (AR 1191.) Dr. Gil reported that Plaintiff was anxious and depressed. (AR 1192.) Plaintiff agreed to trial Latuda, an antipsychotic, was prescribed Ativan, a sedative, and continued her prescription for Lamictal, an anticonvulsant used to treat bipolar disorder. (AR 1192.) On November 10, 2015, Plaintiff saw Dr. Gil for a second individual therapy session. (AR 1197.) At that visit, Plaintiff exhibited an anxious mood but intact insight and judgment. (AR 1198.) Dr. Gil prescribed Seroquel instead of Latuda, prescribed Cogentin, and continued Plaintiff's prescriptions for Ativan and Lamictal. (AR 1198.)

Plaintiff also saw psychiatrist Cynthia Folsome, M.D., at the West Valley Mental Health Center.[3] (*See* AR 1199.) On November 12, 2015, Dr. Folsome recorded Plaintiff's

---

[3] During the administrative hearing, Plaintiff explained that her first treating psychiatrist at the West Valley Mental Health Center was Dr. Folsome, and their treatment relationship lasted until Dr. Folsome went on maternity leave. (AR 65.) Then Plaintiff saw Dr. Davidoff, who left the West Valley Mental Health Center shortly after meeting Plaintiff, and, finally, Plaintiff received treatment from Dr. Jack. (AR 65.) Plaintiff testified that throughout this time she also saw

description of her mental health history as follows: she has had episodes of depression since childhood and also has episodes of mania that have lasted for up to a month; she received outpatient treatment since she was 18 years old; she has had six psychiatric hospitalizations since 2011; she underwent ECT but has had issues with memory and concentration ever since; and she has tried a number of psychiatric medications including Lithium, Geodon, Zoloft, Prozac, Trazodone, Wellbutrin, Xanax, and Gabapentin. (AR 1199.) Plaintiff also reported that was experiencing nightmares and muscle cramps with Latuda. (AR 1199.) Plaintiff described her current symptoms as anxiety, depressed moods, irritability, panic attacks with triggers, anhedonia, low energy, and variable appetite. (AR 1199.)

Plaintiff returned to Dr. Gil for individual therapy on November 17, 2015. (AR 1202.) Plaintiff reported experiencing medication side effects including dry mouth but agreed to continue the medications and contact the psychiatrist if she was not able to manage the side effects. (AR 1202.) Plaintiff saw Dr. Gil again on November 24, 2015 (AR 1203) and December 3, 2015 (AR 1205). Plaintiff saw Dr. Folsome again on December 8, 2015. Plaintiff reported feeling less depressed and having fewer and less severe panic attacks, but she also reported feeling tired and sleeping too much and continuing to struggle with irritability and problems with memory and concentration. (AR 1208.)

On December 10, 2015, Plaintiff saw Dr. Gil for individual therapy and reported increased symptoms of anxiety but stated that she was able to manage symptoms effectively. (AR 1209.) Plaintiff reported doing housesitting and pet sitting "which enable her to be alone and away from others." (AR 1209.)

---

Dr. Gil for talk therapy. (AR 65.) The administrative record confirms that Plaintiff received care from all three psychiatrists (Dr. Folsome, Dr. Davidoff, and Dr. Jack), and that, throughout her care at the West Valley Mental Health Center, Plaintiff continued to see Dr. Gil for group therapy. (*See also* AR 67 (Plaintiff is attending group therapy with Dr. Gil); *see also, e.g.,* AR 1187 (10/19/2015 group therapy session with Dr. Gil), 1204 (11/30/2015 group therapy session with Dr. Gil), 1240 (4/25/2016 group therapy session with Dr. Gil).)

On January 6, 2016, Plaintiff reported to Dr. Folsome that she had not felt depressed "lately" but still experienced anhedonia. (AR 1214.) Plaintiff also reported struggling with anxiety on a daily basis. (AR 1214.) She reported that her irritability had decreased, her memory and concentration problems remained unchanged, and she denied any recent manic or psychotic symptoms. (AR 1214.)

On January 25, 2016, Plaintiff saw Norma Huerta, an Associate Clinical Social Worker ("ASW"), for therapy at the West Valley Mental Health Center. (AR 1218.) Huerta reported that Plaintiff's mood was depressed and anxious, her affect "was congruent to her mood, tearful," and she reported passive thoughts of being better off dead but denied suicide plan/intent. (AR 1218.)

On February 4, 2016, Plaintiff saw Dr. Folsome and reported the she was "not doing so great," feeling more depressed, anxious, and irritable, experiencing more panic attacks since her last appointment, and was unsure if she was having nightmares but stated that she wakes up yelling. (AR 1220.)

On February 10, 2016, Plaintiff saw Huerta again and continued to exhibit a depressed and anxious mood and an affect "congruent to her mood, tearful" and to report passive thoughts of being better off dead. (AR 1222.) Plaintiff reported that she wants to stay in bed all day. (AR 1222.) Huerta discussed activities that might help Plaintiff lift her mood, and Plaintiff stated that she was thinking of taking classes in cake decorating. (AR 1222.)

On February 18, 2016, Plaintiff saw Dr. Folsome and reported that she was "not great," starting to engage in obsessive compulsive behaviors like counting stairs, checking locks and keys three times, etc. (AR 1224.) She reported that she could spend hours a day doing these behaviors. (AR 1224.) Plaintiff continued to complain of a depressed mood, panic attacks, and worry, waking up yelling, and experiencing memory and concentration

9

problems. (AR 1224.) Dr. Folsome continued Plaintiff's prescriptions for Buspar, Seroquel, and Lamictal and told Plaintiff that she could increase her dose of Buspar from 5mg/day to the maximum dose of 60mg/day. (AR 1224.)

On February 22, 2016, Plaintiff saw Huerta. (AR 1226.) Plaintiff's mental status examination was the same – depressed and anxious mood, an affect "congruent to her mood, tearful," and passive thoughts of being better off dead. (AR 1226.)

On March 17, 2016, Plaintiff saw Dr. Folsome. (AR 1230.) Plaintiff reported decreased depression and anxiety but with some lingering obsessive compulsive behaviors (cleaning and counting behaviors). (AR 1230.) Plaintiff reported no panic attacks since her last appointment. (AR 1230.) Dr. Folsome continued Plaintiff's prescriptions for Buspar, Seroquel, Lamcital, and Cogentin and decreased Plaintiff's Ativan dosage. (AR 1230.)

On April 4, 2016, Plaintiff saw Huerta. (AR 1234.) Plaintiff's mental status examination was the same – depressed and anxious mood, an affect "congruent to her mood, tearful," and passive thoughts of being better off dead. (AR 1234.)

On April 14, 2016, Plaintiff saw Huerta. (AR 1236.) Plaintiff's mood was euthymic and her affect congruent to her mood. (AR 1236.) Plaintiff reported that she had been feeling better because she had been busy dog walking, going to the gym, going out with a friend, and looking forward to a visit from her brother. (AR 1236.) Plaintiff also reported having more energy. (AR 1236.)

On April 18, 2016, Plaintiff saw Dr. Folsome and reported that things had been going well until two days earlier and she now felt "not so great" but could not identify any triggers. (AR 1238.) Plaintiff complained of depressed mood, crying spells, anhedonia, decreased appetite, sleeping more during the day, continued counting and cleaning behaviors. (AR

10

1238.)  Plaintiff reported that she has a hard time identifying episodes of mania but that, according to her mother, Plaintiff had been manic for the past couple of weeks.  (AR 1238.) Plaintiff said she had been "talking too much and mood elevated . . . , going to the gym several times a day, decreased need for sleep during that time, creative and random ideas." (AR 1238.)  Dr. Folsome increased Plaintiff's Seroquel dosage and continued her prescriptions for Buspar and Lamictal.  (AR 1238.)

On April 28, 2016, Plaintiff saw Huerta who observed that Plaintiff's mood was "okay" and her affect congruent to her mood.  (AR 1241.)  Plaintiff reported that it had been "rough . . . due to her depression coming back."  (AR 1241.)

On May 2, 2016, Plaintiff saw Dr. Folsome and reported that her depression was better but her anxiety was high, her night sleep "fragmented," and she continued to have counting and cleaning behaviors.  (AR 1243.)  Dr. Folsome observed that Plaintiff's mood and affect were slightly anxious.  (AR 1243.)

On May 11, 2016, Plaintiff saw Huerta, who observed that Plaintiff's mood was euthymic and her affect congruent to her mood.  (AR 1246.)  Plaintiff reported feeling much better, going to the gym four times a week, going out with her friend more, and thinking about volunteering.  (AR 1246.)

On May 23, 2016, Plaintiff saw Huerta, who observed that Plaintiff's mood was "okay" and her affect congruent to her mood.  (AR 1247.)  Plaintiff reported she has been thinking more positively and would try to volunteer with rescue animals.  (AR 1247.)

On June 9, 2016, Plaintiff saw Julia Davidoff, M.D., instead of Dr. Folsome.  (AR 1250.)  Plaintiff reported feeling depressed, having a hard time getting out of bed, and poor motivation, but did not report panic attacks.  (AR 1250.)  Plaintiff asked to go off Seroquel

11

because of the weight gain, so Dr. Davidoff changed her prescription to Latuda, discontinued her prescription for Congentin, and continued Plaintiff's prescriptions for Buspar and Lamictal. (AR 1250.)

On June 9, 2016, Plaintiff saw Huerta, who reported that Plaintiff's mood was depressed and her affect congruent to her mood. (AR 1251.) Plaintiff reported that her mother had suffered a heart attack, and Plaintiff wanted to isolate herself and be alone. (AR 1251.)

### 2. Opinion of Dr. Jack

On October 19, 2016, Timothy Jack, M.D., with the West Valley Mental Health Center, completed a two-page check-the-box questionnaire on which he indicated that Plaintiff had been receiving treatment the West Valley Mental Health Center since October 15, 2015 and was under his care at the clinic since August 12, 2016. (AR 1289.) On the questionnaire, Dr. Jack indicated that Plaintiff was markedly limited in the following areas: her ability to remember locations and work-like procedures; her ability to understand, remember, and carry out simple instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, be punctual, and maintain regular attendance; her ability to work in coordination with or proximity to others without being distracted; her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers without distracting them or exhibiting extreme behaviors; and her ability to respond appropriately to changes in the work setting. (AR 1290.) He further indicated that Plaintiff's impairments or treatments would cause her to be absent from work more than three times a month. (AR 1290.)

\\

\\

### 3. ALJ's Decision and Discussion

The ALJ discounted portions of Dr. Jack's opinion, including his assessment that Plaintiff would be markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors and that she would miss work more than three times a month. (*Compare* AR 135, 76, 77, 79 *with* AR 1290.) The ALJ explained that "[a]lthough Dr. Jack is a treating doctor, his opinion is not consistent with the medical evidence. Additionally, it is also not consistent with [Plaintiff's] activities of daily living, which include dog walking for pay, going to the gym, and going out with a friend." (AR 137.)

#### a. Inconsistency with the Medical Evidence

The ALJ cited no medical evidence in support of his statement that Dr. Jack's opinion is inconsistent with the medical evidence, and the Court, after reviewing the record, could not locate substantial evidence in the record that supports the ALJ's statement. The ALJ may not discredit a treating physician's opinion solely on the grounds that it conflicts with the opinions of the examining and reviewing physicians. Instead, the ALJ, having identified the conflict, must identify *specific* and legitimate reasons supported by substantial evidence in the record for crediting the opinions of the treating and examining physicians over the opinion of the treating psychiatrist. Given the ALJ's failure to identify *any* medical evidence that conflicted with Dr. Jack's opinion, and the Court's inability to identify substantial evidence in the record supporting the ALJ's assertion, the purported inconsistency is not a specific and legitimate reason supported by substantial evidence for discounting Dr. Jack's opinion.

In reaching this conclusion, the Court carefully reviewed the May 22, 2014 opinion of Plaintiff's prior treating psychiatrist, Michael Frankel, M.D., and Dr. Frankel's

accompanying treatment records. (AR 962.) However, Dr. Frankel stated that he was "not in a position to comment on [Plaintiff's] condition since [March 8, 2013]," the last time he saw Plaintiff.[4] (AR 962.) Accordingly, his opinion is not at odds with Dr. Jack's opinion, which concerns the period of time during which Plaintiff was receiving treatment at the West Valley Mental Health Center and does not purport to reach back in time to the period, before the alleged onset date, when Plaintiff was receiving treatment from Dr. Frankel. In light of the foregoing, the ALJ's first reason for discounting Dr. Jack's opinion – its purported inconsistency with the medical evidence – is not supported by substantial evidence in the record.

### b. Plaintiff's Activities of Daily Living

The ALJ's second reason concerns Plaintiff's activities of daily living, which, according to the ALJ, "include dog walking for pay, going to the gym, and going out with a friend." (AR 137.) Plaintiff's description of her activities of daily living include two Adult Function Reports, one Third Party Adult Function Report, and Plaintiff's testimony at the administrative hearing. Plaintiff's treatment notes from the West Valley Mental Health

---

[4]        Although Dr. Frankel stated that he was not in a position to comment on Plaintiff's condition during the period in question (*i.e.*, on and after November 8, 2013), the ALJ stated that he accorded Dr. Frankel's opinion "great weight." (AR 137.)  The ALJ explained that he relied heavily on Dr. Frankel's opinion because "it was issued prior to [Plaintiff's] alleged onset date," "is consistent with the record as a whole and based on the fact that the doctor has a long treatment history with [Plaintiff]." (AR 137.)  The ALJ's rationale is strange given that Dr. Frankel appears to have treated Plaintiff for a shorter period of time (June 2012 into March 2013) than the staff at Dr. Jack's clinic (October 2015 into October 2016) – and, unlike Dr. Jack and his colleagues, Dr. Frankel expressly said that he could not offer a comment on Plaintiff's condition during the alleged period of disability.  Further, Dr. Frankel's opinion indicated that he saw Plaintiff for the limited purpose of ECT treatments and, indeed, the Court located no treatment notes from Dr. Frankel other than those concerning his administration of ECT to Plaintiff.  Accordingly, there are no records from Dr. Frankel reflecting mental status examinations or other objective findings concerning Plaintiff's mental health.  Nevertheless, the Court recognizes that both Dr. Frankel and Plaintiff appear to agree that the ECT regimen was effective, although Plaintiff also found the treatments prohibitively costly and accompanied by deficits in memory and attention.  (AR 936 (ECT is beneficial but causes some memory impairment and "HAs"), 1189 (interested in continuing ECT but lacks resources to do so), 1199 (had issues with memory and concentration ever since undergoing ECT).)  Finally, the record also reveals that, despite the purported efficacy of Plaintiff's ECT treatments, Plaintiff was hospitalized for psychiatric reasons (increase thoughts of harming herself with a plan to overdose on drugs) during the course of her ECT treatments.  (AR 936 (1/9/2013 psychiatric hospitalization).)

Center, which are described above, also shed some light on Plaintiff's activities of daily living during the relevant period.

i.      Plaintiff's Activities According to the Function Reports

On May 22, 2014, Plaintiff stated in an Adult Function Report that "dressing, bathing, and general hygiene is a chore. It exhausts me. It's a major accomplishment." (AR 315.) She stated that she uses a check list to remind her to take care of her grooming needs, such as brushing her teeth, brushing her hair, and using deodorant. (AR 316.) She stated that she used to cook all of her meals but is now limited to preparing sandwiches because she does not have the desire or energy to cook meals. (AR 316.) She stated that "stay[s] inside mostly" and crochets. (AR 315.) She stated that, if she needs to shop for something, she goes out "very early in the morning or late at night when less people are there." (AR 315.) She stated that she goes out once a week to shop for groceries and yarn and goes outside "a couple times a week." (AR 317.) She stated that: she can no longer concentrate to read; music and noise make her anxious; and being in public makes her anxious. (AR 318.) She stated that she sees her parents once a month and prefers to be alone. (AR 318-19.)

On May 22, 2014, Plaintiff's then roommate, Cynthia A. Lavene, completed a Third Party Function Report, in which she stated that Plaintiff's conditions render her unable to work face to face with people. (AR 327.) She wrote that during the day, Plaintiff "sleep[s], stays in room." (AR 328.) She wrote that Plaintiff's condition makes bathing "a chore" for her, and Plaintiff bathes maybe three times per week. (AR 328.) Lavene stated that Plaintiff's meal preparation is limited to "convenience foods majority of time – frozen etc." but maybe two to three times a month she prepares casseroles. (AR 329.) Lavene stated that if she does not ask or tell Plaintiff to do house chores, "it won't get done." (AR 329.) Lavene stated that Plaintiff goes outside four times a week and shops for food once a week for approximately 30 minutes. (AR 330.) Lavene stated that Plaintiff "used to go camping –

15

reading – movies – now watches way too much TV – never wants to do anything" and "does not enjoy face to face conversation." (AR 331.) Lavene stated that Plaintiff's "social activity has all stopped." (AR 332.) She stated that Plaintiff can follow spoken instructions but "may need repeated instruction." (AR 332.) Finally, Lavene wrote that Plaintiff "can have a panic attack just at the thought of meeting new people." (AR 333.)

Approximately seven months later, on December 18, 2014, Plaintiff completed a second Adult Function Report. She stated that from the time she wakes up until the time she goes to bed she: eats breakfast; takes medication; sleeps; watches TV; eats dinner; and takes medication. (AR 356.) She stated that she dresses, bathes, and cares for her hair one to three times a week, depending on whether she has to go out. (AR 356.) She stated that she used to cook and bake daily and now is limited to preparing frozen dinners or ready to eat snacks. (AR 357.) She stated that she goes outside a few times a week and shops for groceries every other week. (AR 358.) She stated that she cannot engage in any of her former hobbies and interests because she either cannot concentrate long enough or gets anxiety. (AR 359.)

ii.    Testimony at the Administrative Hearing

On September 29, 2016, more than two years after her initial Adult Function Report, Plaintiff testified at the administrative hearing. Plaintiff testified that she lives with her parents. (AR 46.) She testified that she leaves the house about twice a week. (AR 56.) She testified that she prefers to stay home because of the anxiety of being around people and she finds "noise . . . really difficult." (AR 56.) She added that her depression on some days prevents her from getting out of bed. (AR 56.) She testified that when "the mania hits," she makes "very quick decisions without thinking . . . think[s] life's going to be great somewhere else," packs her bag, and takes off to another city or state. (AR 57.) She

testified that "the mania and the up, the high, might last for a while; and then, [she's] back down again." (AR 57.)

The ALJ asked Plaintiff about the notes from the West Valley Mental Health Center indicating that Plaintiff was going to the gym and, on some days, went to the gym "multiple times a day." (AR 57.) Plaintiff responded, "No," (AR 57), adding later, "I haven't been to the gym in over two months." (AR 58.) However, Plaintiff confirmed for the ALJ that, for about a month earlier in the year, she had been going to the gym four times a week. (AR 69.) The ALJ then asked, "When you talked to your therapist about that [going to the gym four times a week], you said that you had an elevated mood, were sleeping less, and having like random ideas. Do you remember that?" and Plaintiff responded, "No." (AR 69.) Nevertheless, Plaintiff testified that when she has these bursts of physical energy and is "doing something . . . like going to the gym a lot," her brain is "on fast-forward," describing it as "the opposite of the depression . . . the other pole." (AR 69, 70.)

Plaintiff testified that her anxiety started after she received the ECT treatments with Dr. Frankel. (AR 63.) Elsewhere she testified that, while she was in Las Vegas – where she underwent the ECT treatments with Dr. Frankel – she was in a "partial hospitalization program . . . trying to deal with the anxiety" in addition to the depression. (AR 61-62.) She testified that her anxiety was triggered in part by noise, which became a problem for her at her job at Target and at her jobs at a daycare and a waterslide. (AR 63, 64.) Plaintiff stated that for meals she eats microwave meals and that her parents sometimes bring her back food from a restaurant. (AR 67.)

Plaintiff testified that she dog sits for friends and relatives when they go out of town and gets paid "a little money" for it. (AR 54.) She testified that she does this dog sitting work maybe six times a year, mostly on weekends. (AR 55.) She testified that she generally

makes $25/day dog sitting and the most money she has made from dog sitting in the course of a month was $100. (AR 55, 68.)

Plaintiff also testified that she engages in compulsive behaviors: she counts her steps and takes steps backwards and forwards in order to make sure her total number of steps is divisible by three; and she cleans obsessively, sometimes spending hours scrubbing spots that may not even be there. (AR 68.) Finally, Plaintiff testified that she does not like to be around people so the does not do things socially. (AR 70.) However, she has a cousin who comes to her house once or twice a week, and they watch *Dancing with the Stars* together. (AR 70.)

### iii. Discussion

The ALJ correctly found that the Administrative Record's description of Plaintiff's activities of daily living is inconsistent with Dr. Jack's assessment that Plaintiff would be markedly limited in her ability to accept instructions and respond to criticism from supervisors. There is no evidence that Plaintiff struggled to accept instructions or criticism from her dog sitting clients or from her roommate. Plaintiff also indicated in her Adult Function Reports that she gets along "fine" with authority figures, including the police and doctors, both of whom, presumably, have given Plaintiff instructions at various points. (AR 361.) Accordingly, the ALJ's reference to Plaintiff's activities of daily living was a specific and legitimate reason supported by substantial evidence in the record for discounting this portion of Dr. Jack's opinion.

However, the ALJ erred in citing Plaintiff's activities of daily living as a basis for discounting Dr. Jack's opinion that Plaintiff would miss work more than three times a month. Plaintiff testified that she dog sat maybe six times a year, always for friends or relatives, and never for more than a few days at a time. Additionally, Plaintiff's rate of pay

($25/hour) and maximum monthly earnings ($100) suggest that she never dog sat for more than four days during the course of a single month.  In sum, Plaintiff's brief and very occasional dog sitting does not indicate that she would be able to consistently work forty-hour weeks without missing work three times a month.

Similarly, Plaintiff's references to going to the gym appear to be limited to her periods of mania, which can last up to a month, are accompanied by other troubling behaviors, including random ideas and a proclivity for moving out of state on a whim, and, are not accurate reflections of what she can do on a consistent basis.  (*See* AR 1199 (manic periods last up to a month); 1236 (4/16/16 – Plaintiff reports going to the gym), 1238 (4/18/2016 – Plaintiff is depressed again and her mother told her that she had been going through a manic episode – had been going to the gym multiple times a day); *see also* AR 1246 (5/11/2016 – Plaintiff reported feeling better, going to the gym four times a week, going out with her friend), 1250 (6/9/2016 – Plaintiff reported feeling depressed again, having a hard time getting out of bed).)  During her depressive periods, Plaintiff struggles to bathe, leave her house, go out in public, and be around people – all of which would hinder her ability to regularly show up for work.  Plaintiff also suffers from compulsive behaviors – requiring her total number of steps to be divisible by three and scrubbing invisible spots for hours, sometimes in the middle of night – that would also seemingly interfere with her ability to regularly show up for work.  Finally, the ALJ does not cite, and the record does not reveal, that Plaintiff engaged in any activities of daily living that required Plaintiff to leave the house – or even sustain basic interactions with people who are neither a close friend or relative nor a trained mental health professional – five days a week.  Accordingly, the ALJ's reference to Plaintiff's activities of daily living is not a specific and legitimate reason supported by substantial evidence in the record for discounting Dr. Jack's assessment that Plaintiff would miss work three times a month.

Because the ALJ failed to articulate any specific and legitimate reason supported by substantial evidence for discounting Dr. Jack's opinion that Plaintiff would miss work three times a month, the matter must be remanded for further consideration of this portion of Dr. Jack's opinion.

## B. ALJ's Evaluation of the Opinion of Marysol Rezanov, LCSW

### 1. Treatment Records and Opinion of Marysol Rezanov, LCSW

Plaintiff further challenges the ALJ's rejection of the opinion of one of her treating therapists, Marysol Rezanov, LCSW. (Joint Stip. at 3.) On an undated Outpatient Treatment Request Form directed to the Health Plan of Nevada's mental health care component, Behavioral Health Care Options, Inc., Rezanov identified Plaintiff's diagnosis as "Bipolar Dx," reported that Plaintiff experiences "feelings of loneliness, SI w/o plan, low self-esteem," and indicated that the planned interventions would be treatment once a week. (AR 1160.) In January 2015, Rezanov received authorization from both Plaintiff and the Health Plan of Nevada for her practice, Nueva Vida Mental Health, to provide outpatient therapeutic services to Plaintiff. (AR 1161; *see also id.* at 1150-51.) A few months later, on March 25, 2015, Plaintiff was discharged from Rezanov's care because she was told by her psychiatrist that she needed to switch therapists. (AR 1159.)

There are no notes reflecting the substance of Rezanov's treatment of Plaintiff. (*See generally* AR 1150-61.) Nevertheless, on October 3, 2016, more than a year after Plaintiff was discharged from Rezanov's care, Rezanov completed a check-the-box Mental Impairment Questionnaire on which she indicated that Plaintiff's symptoms included: oddities of thought, perception, and behavior; sleep disturbance; personality change; persistent disturbances of mood or affect; emotional withdrawal and/or isolation; emotional lability and impairment in impulse control; blunt affect; illogical thinking; delusions or

paranoid thinking; flight of ideas; inflated self-esteem; recurrent severe panic attacks; recurrent and intrusive recollections of a traumatic experience, which are source of marked distress; pathologically inappropriate suspiciousness or hostility; pathological dependence, passivity, or aggressivity; intense and unstable interpersonal relationships and impulsive and damaging behavior. (AR 1287.) Rezanov left blank the space provided to respond to the question "Describe the clinical findings including results of mental status examination which demonstrate the severity of your patient's mental impairments and symptoms." (AR 1288.) She similarly wrote "unknown" in response to a question about any side effects that Plaintiff experienced from medications. (AR 1288.) Rezanov opined that Plaintiff was not capable of performing a full-time job, working eight hours a day, five days per week, on a regular and continuing basis and had the following functional limitations: moderate limitation in the ability to maintain attention and concentration for extended periods; moderate limitation in the ability to perform activities within a schedule, be punctual, and maintain regular attendance; extreme limitation in the ability to work in coordination with or proximity to others without being distracted; moderate limitation in the ability to make simple work related decisions; extreme limitation in the ability to interact appropriately with the general public; marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors; extreme limitation in the ability to get along with coworkers without distracting them or exhibiting extreme behaviors; extreme limitation in the ability to maintain socially appropriate behavior and adhere to basic standards of neatness/cleanliness; and marked limitation in the ability to respond appropriately to changes in the work setting. (AR 1288.)

## 2. ALJ's Opinion and Discussion

The ALJ discounted Rezanov's opinion, stating that Rezanov is not an "acceptable medical source," the limitations Rezanov assessed "are not consistent with the medical evidence," and Rezanov's opinion is dated six months after her treatment relationship with

Plaintiff ended. (AR 138.) When the opinion at issue comes from a medical professional who is not an "acceptable medical source" under the regulations, the ALJ has more leeway to discount it. *See* 20 C.F.R. §§ 404.1502 (defining the term "acceptable medical source"), 416.902 (same), 20 C.F.R. §§ 404.1527(a)(2) (defining "treating source" as the "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]"), 416.927(a)(2) (same). Specifically, the opinions of a non-acceptable medical source, such as a licensed clinical social worker, are entitled only to the weight warranted by the facts of the case, 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1), and the ALJ may discount her opinions after articulating "germane" reasons for doing so. *See Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015). Nevertheless, in some circumstances, "an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1).

The Court finds that, to the extent that the ALJ may have failed to articulate germane reasons for discounting Rezanov's opinion, the error is harmless because, despite any possible error, "the agency's path may reasonably be discerned." *Brown-Hunter*, 806 F.3d at 492. Specifically, there are no treatment records supporting Rezanov's opinion, she identified no symptoms or clinical findings that supported her opinion, she also admitted to having no knowledge of any side effects associated with Plaintiff's medications, and her purported period of treatment of Plaintiff was extraordinarily short – no more than three months. In light of the foregoing, the Court can reasonably discern from the record that the ALJ correctly determined that the facts of the case do not warrant crediting Rezanov's opinion.

\\

\\

\\

**II.     The ALJ's Evaluation of Plaintiff's Credibility**

The second issue in dispute is whether the ALJ properly evaluated the credibility of Plaintiff's statements and testimony about the severity of her symptoms and functional limitations.   (Joint Stip. at 23.)   Plaintiff's description of her symptoms and functional limitations is discussed in greater detail above.   The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (AR 136.)  The ALJ explained that Plaintiff's complaints of disabling symptoms and limitations were not credible given Plaintiff's daily activities, which included crocheting as a hobby, shopping in stores during less crowded hours, preparing sandwiches, going to the gym, and going out with a friend, and interacting with family and friends via text and social media. (AR 136.)  Secondly, the ALJ explained that Plaintiff had engaged in some work activity – albeit, not substantial gainful activity – after the alleged onset date. (AR 137-38.) Specifically, the ALJ noted that Plaintiff had done some dog walking work and also reported selling things on eBay. (AR 137.)  Finally, the ALJ observed that as of April 2016, Plaintiff reported feeling better, and he asserted that Plaintiff's GAF scores had gone up over time, suggesting that her condition has improved.  (AR 136) (citing Exhibits 1F1, 4F137, 8F, and 14F3).

  **A. Applicable Law**

An ALJ must make two findings before determining that a claimant's pain or symptom testimony is not credible. *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  "Second, if

the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1161 (9th Cir. 2008) (court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear and convincing standard").

In weighing a plaintiff's credibility, the ALJ may consider many factors, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony . . . that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). However, "subjective pain testimony cannot be rejected on the *sole* ground that it is not fully corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (emphasis added) (citation omitted). Further, an ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities either: "contradict [the plaintiff's] other testimony"; or "meet the threshold for transferable work skills" – that is, where the plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Orn*, 495 F.3d at 639; *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996). Finally, the ALJ must "specifically identify the testimony [from the claimant that] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler*, 775 F.3d at 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "General findings are insufficient." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

**B. Discussion**

The ALJ's reasons for finding Plaintiff's statements and testimony are not specific, clear, convincing, and supported by substantial evidence in the record.

**1. Plaintiff's Daily Activities**

The ALJ's first reason for finding Plaintiff less than fully credible was Plaintiff's daily activities, and he specifically mentioned her ability to crochet as a hobby, shop during less crowded hours, prepare sandwiches, go the gym, go out with a friend, and interact with family and friends via text and social media. (AR 136.) As stated above, an ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities either: "contradict [the plaintiff's] other testimony"; or "meet the threshold for transferable work skills" – that is, where the plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Orn*, 495 F.3d at 639. The ALJ does not state, and there is no indication in the record, that Plaintiff was able to spend a substantial portion of her day performing household chores or other activities that are transferable to a work setting. Instead, the ALJ asserts that Plaintiff's complaints and allegations of total disability are inconsistent with her ability to: crochet, shop (albeit, early in the morning or late at night when she is unlikely to encounter many other people are at the store), make sandwiches, and text; and, during her manic periods, go to the gym and go out with a friend.

However, "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (internal quotation marks and citation omitted); *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not

in any way detract from her credibility as to her overall disability"). Further, Plaintiff's limited ability to shop coupled with her continued ability and interest in performing activities that are easily performed alone, at home, and in pajamas – crocheting, preparing sandwiches and microwave meals, and texting or using social media – do not indicate that Plaintiff retains a greater functional capacity than what she has alleged.

Similarly, the ALJ errs in relying on Plaintiff's description of her abilities during her occasional manic periods – which include going to the gym and going out with a friend – to find her description of her abilities during her more common state of depression less than fully credible. As stated above, Plaintiff's periods of mania tend to last no more than a month, are coupled with other troubling symptoms, and are not indicative of her activities and functional capacity most of the time. Accordingly, the ALJ's references to Plaintiff's daily activities is not a clear and convincing reason supported by substantial evidence for finding Plaintiff's statements and testimony less than fully credible.

## 2. Plaintiff's Work Activity After the Alleged Onset Date

The ALJ's second reason for finding Plaintiff's statements less than fully credible is that she engaged in some work activity after the alleged onset date, apparently referring to her intermittent work with dogs. (*See* AR 133, 137-38.) The ALJ states that Plaintiff's ability to take care of friends and relatives' dogs after the alleged onset date suggests that her activities are, in fact, greater than what she alleged. (AR 137-38.) The ALJ also noted that Plaintiff reported selling things on eBay. (AR 137.) As stated above, Plaintiff's work as a dog sitter was very occasional – no more than six times a year, always for friends or relatives, and never lasted more than a few days at a time. Additionally, Plaintiff testified that she never earned more than $100 a month from this work, which suggests that, given her rate of pay ($25/hour), she never dog sat for more than four days during the course of a single month. There is also no evidence in the record concerning Plaintiff's tasks and

responsibilities while dog sitting, accordingly there is no evidence that her brief and sporadic work with dogs required her to do anything beyond the functional capacity she has alleged. Similarly, Plaintiff's ability to sell some things on eBay, a task that, like most of Plaintiff's preferred activities, can largely be performed at home alone in one's pajamas, is not inconsistent with her allegations regarding the severity of her symptoms and functional limitations.

### 3. Plaintiff's Improvement

The ALJ's third and final reason for finding Plaintiff less than fully credible was that the record indicated that Plaintiff's condition had improved over time. (*See* AR 136.) Specifically, the ALJ noted that, as of April 2016, Plaintiff reported feeling better, and he observed that Plaintiff's GAF scores went up over time. (AR 136) (citing Exhibits 1F1, 4F137, 8F, and 14F3).

With respect to Plaintiff's April 2016 report, as the Court has repeatedly noted above, Plaintiff was in a state of mania. Specifically, on April 14, 2016, Plaintiff reported to her therapist, Huerta, that she had more energy and had been feeling better, going to the gym, dog walking, and going out with a friend. (AR 1236.) Four days later, Plaintiff saw Dr. Folsome and reported that things had been going well until two days earlier and she now felt "not so great," with a depressed mood, crying spells, anhedonia, decreased appetite, sleeping during the day, and compulsive counting and cleaning behaviors. (AR 1238.) Plaintiff told Dr. Folsome that she has a hard time identifying episodes of mania but that her mother had said Plaintiff had been manic for the past couple of weeks: "talking too much and mood elevated . . . , going to the gym several times a day, decreased need for sleep . . ., creative and random ideas." (AR 1238.) Dr. Folsome responded to this report by increasing Plaintiff's Seroquel dosage. (AR 1238.) Given that Plaintiff's report of improvement in April 2016 was fleeting and the result of mania, rather than actual longitudinal improvement,

it was a not a convincing reason supported by substantial evidence for finding Plaintiff's statements less than fully credible. *See also Garrison*, 759 F.3d at 1017 ("it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working").

The ALJ's references to Plaintiff's GAF scores is similarly unavailing. The ALJ's citations are primarily to Plaintiff's GAF scores either upon admission or discharge from her numerous psychiatric hospitalizations. The first, Exhibit 1F1, refers to Plaintiff's GAF score of 25[5] on June 30, 2011 upon her voluntary admission to Vistal Del Mar Hospital, at which time Plaintiff was presenting as depressed and suicidal. (AR 423.) The second, Exhibit 4F137, refers to Plaintiff's GAF score of 30 on May 14, 2012 upon her voluntary admission to Northridge Hospital Medical Center, at which time Plaintiff was experiencing significant suicidal ideation, limited insight, and questionable judgment. (AR 906-07.) In contrast, the third, Exhibit 8F, refers to Plaintiff's August 16, 2014 examination by the consulting psychiatrist, Norma R. Aguilar, M.D., who assessed a GAF score of 60-65, indicating moderate to mild symptoms. (AR 970.) The fourth, Exhibit 14F3, refers to Plaintiff's GAF score of 55 in April 2015 upon her discharge from a seven-day psychiatric hospitalization at Desert Parkway Behavioral Healthcare Hospital. (AR 1039-40.) The hospital records reflect that Plaintiff's psychiatrist at the time, Dr. Rosa Bellota, referred Plaintiff for hospitalization at the Desert Parkway Behavioral Healthcare Hospital based on Plaintiff's depression resulting in a significant loss of functioning and that at the time Plaintiff was admitted she was assessed with a GAF score of 50. (AR 1038.) GAF scores between of 41-50 indicate serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or serious

---

[5] A GAF score of 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *See* Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (revised 4th ed. 2000). The Commissioner has stated that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings," 65 Fed. Reg. 50764, 50764-65 (Aug. 21, 2000), and the most recent edition of the DSM "dropped" the GAF scale. Diagnostic And Statistical Manual Of Mental Disorders 16 (5th ed. 2012).

impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV 34 (revised 4th ed. 2000).

Contrary to the ALJ's characterization of these GAF scores, they do not show improvement that conflicts with Plaintiff's allegations regarding the severity of symptoms and functional limitations. Instead, the ALJ's list of Plaintiff's GAF scores reveals the extent to which Plaintiff's symptoms "wax and wane in the course of treatment." *Cf. Garrison*, 759 F.3d at 1017 ("[I]t is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence."). Most significantly, despite being assessed a GAF score of 60-65 during her August 2014 examination by the consulting psychiatrist, nine months later Plaintiff's condition deteriorated to the point that her treating psychiatrist referred her for a seven-day psychiatric hospitalization. The record also indicates that this was Plaintiff's sixth psychiatric hospitalization, with the prior hospitalization occurring two years prior in January 2013 when she presented at the Woodland Hills Medical Center with suicidal ideation with a plan. (AR 936-940; *see also* AR 1199 (six psychiatric hospitalizations between 2011 and 11/12/2015).) Accordingly, the ALJ's third reason for finding Plaintiff less than fully credible – her "improvement" as based on her GAF scores during the preceding five years – is not a convincing reason supported by substantial evidence for the ALJ's adverse credibility determination.

## III.    Remand is Warranted

Based on the foregoing, the ALJ erred both in his evaluation of Dr. Jack's opinion that Plaintiff would miss three days of work a month due to psychiatric symptoms and in his evaluation of the credibility of Plaintiff's statements about her symptoms and functional limitations. The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172,

1175-78 (9th Cir. 2000). A district court may remand for an award of benefits when the following three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Id.* n.26; *see also Balladarez v. Colvin*, No. CV 13-9490-MAN, 2014 WL 7185342, at *15 (C.D. Cal. Dec. 16, 2014) (declining to award for benefits because, *inter alia*, the VE did not receive an opportunity to hypothesize about whether a claimant of plaintiff's age, education, and work experience who has a residual functional capacity based on a proper evaluation of the medical record could perform work that exists in significant numbers in the national economy). However, even if those three requirements are met, the Court retains "flexibility" in determining the appropriate remedy and may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

In this case, the ALJ asked the VE whether a claimant of Plaintiff's age, education, and work experience who has Plaintiff's residual functional capacity could maintain any of the representative occupations previously identified by the VE – cleaner (DOT 381.687-018), polisher (DOT 761.684-026), and marker (DOT 209.587-034) – if she would miss three days of work a month due to psychiatric symptoms. (AR 79.) The VE stated, "No, they would not be able to maintain these jobs. These workers would certainly call attention to themselves, and there would be a significant reduction in productivity, and this person would not be maintained in a work setting." (AR 79.) The VE added that this opinion was "not in the DOT" but, rather, was based on his "accumulated professional knowledge and

30

experience." (AR 79.) The ALJ did not then ask whether other jobs exist in significant numbers in the national economy that a claimant of Plaintiff's age, education, and work experience who has Plaintiff's residual functional capacity could perform if she would miss three days of work a month due to psychiatric symptoms. It is also unclear whether the VE's testimony was that an individual with these limitations "would not be maintained" in *any* work setting, or, alternatively, that she would not be maintained in the work setting associated with the representative occupations of cleaner (DOT 381.687-018), polisher (DOT 761.684-026), and marker (DOT 209.587-034). (AR 139.) In light of the foregoing, the Court cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand. *See Garrison*, 759 F.3d at 1020. This case, then, is not the "rare exception" in which the credit as true rule should be applied and the matter remanded for the calculation and award of benefits. *See Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017). Therefore, the Court remands for further consideration.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

# CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY

DATE: June 12, 2019

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE